FILED

2025 Mar-28  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MAXRELIEF USA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NO: 5:22-cv-00270-LCB** |
| | ) | |
| **FULFYLD, LLC, KHANITECH,** | ) | |
| **LLC and AJESH KHANIJOW,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

| | |
|---|---|
| **FULFYLD, LLC,** | ) |
| | ) |
| **Counterclaim Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MAXRELIEF USA, INC.,** | ) |
| | ) |
| **Counterclaim Defendant.** | ) |

## DEFENDANTS FULFYLD, LLC AND AJESH KHANIJOW'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW <u>IN SUPPORT THEREOF</u>

# **TABLE OF CONTENTS**

STATEMENT OF UNDISPUTED FACTS .................................................................... 3

   I.   The Parties ................................................................................................. 3

   II.   The Contract between MaxRelief and Fulfyld ................................................. 5

   III.   The Dispute Between MaxRelief and Fulfyld ............................................. 9

   IV.   MaxRelief's Alleged Damages ................................................................. 10

STANDARD OF REVIEW ....................................................................................... 13

ARGUMENT ......................................................................................................... 14

   I.   Because of the intracorporate conspiracy doctrine, Plaintiff's conspiracy claim fails, and Defendants are entitled to summary judgment. ......................... 14

   II.   Plaintiff's conversion claim against Fulfyld and Khanijow fails as a matter of law ........................................................................................................... 15

   III.   MaxRelief cannot show that Khanijow has been unjustly enriched. ........ 18

   IV.   The damages sought by MaxRelief should be limited in accordance with the express terms of the Contract. ........................................................................ 19

      A.   Because MaxRelief ratified the Contract on numerous occasions, a valid contract exists between MaxRelief and Fulfyld. .............................................. 19

      B.   Many different provisions in the Contract limit MaxRelief's claimed damages. ...................................................................................................... 22

      C.   Alternatively, MaxRelief cannot substantiate its lost profits calculation because it failed to designate an expert witness. ............................................ 25

CONCLUSION ..................................................................................................... 25

Defendants Fulfyld, LLC ("Fulfyld") and Ajesh Khanijow ("Khanijow" and together with Fulfyld, "Defendants"[1]) move this Court for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to Plaintiff MaxRelief USA, Inc.'s ("Plaintiff" or "MaxRelief") claims for conspiracy (Count VII) and conversion (Count VI). In addition, Khanijow moves for summary judgment as to MaxRelief's claim for unjust enrichment (Count V). Moreover, many of MaxRelief's alleged damages are either barred or limited by the terms of the parties' agreement. As shown herein, summary judgment is proper in this case because there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

### I.    The Parties

1.    MaxRelief makes and distributes health-oriented products, such as personal care items, cosmetics, and pain relief products. Doc. 64 at ¶¶ 1, 8.

2.    MaxRelief's products are sold in the United States and globally. *Id.*

3.    MaxRelief relies on third-party fulfillment companies that store products that are ready for sale, fulfill orders, then ship the products to customers throughout the country. *Id.* at ¶ 8.

---

[1] Defendants note that the claims (aside from the declaratory judgment claim related to piercing the corporate veil) against Khanitech, LLC were dismissed on March 26, 2025. *See* Doc. 87.

4.      Peter Spoto ("Spoto") is the sole employee and officer of MaxRelief. Peter Spoto Deposition ("Spoto Dep.") (Exhibit A) at 18:18–21, 34:5–8.

5.      Spoto's day-to-day responsibilities include making sure inventory is available to be sold and ordering additional inventory if needed. *Id*. at 20:3–8.

6.      Fulfyld is a fulfillment company that provides warehousing, pick and packing of orders, and shipping services to companies such as MaxRelief. Doc. 64 at ¶¶ 2, 9; *see also* Kelsey Huber Deposition ("Huber Dep.") (Exhibit B), 18:7–19:15; Ajesh Khanijow Deposition (July 21, 2022) ("July 2022 Khanijow Dep.") (Exhibit C), 23:11–19.

7.      Khanijow is employed by Fulfyd and serves as its CEO. Ajesh Khanijow Deposition (January 30, 2025) ("Khanitech Dep.") (Exhibit D), 44:23–45:5.

8.      Containers Plus, Inc. is the sole member of Fulfyld, which is in turn solely owned by Khanijow. Khanitech Dep. 45:8–19, 47:3–16; July 2022 Khanijow Dep. at 22:14–23:01, 31:3–4; Ajesh Khanijow Deposition (December 9, 2022) ("Dec. 2022 Khanijow Dep.") (Exhibit E), 15:15–16:20.

9.      Khanitech owns commercial real estate and then leases those properties out to tenants. Khanitech Dep. at 15:12–14.

10.     At the time that Fulfyld was providing services to MaxRelief, Fulfyld was leasing one of its warehouse properties from Khanitech, and MaxRelief's

products were stored at that warehouse. *Id*. at 29:14–21, 57:1–15; Ex. 3 to Khanitech Dep. at pp. 14–22; Dec. 2022 Khanijow Dep. at 21:18–25; Doc. 64 at ¶ 3.

11.     Khanitech played no role in any of Fulfyld's decisions with regards to its relationship with MaxRelief or MaxRelief's products. *Id*. at 54:15–55:9. Rather, Khanitech is only the landlord. *Id*. at 31:7–12, 56:10–21.

12.     Spoto testified Khanitech was sued because "[his] goods were stored in Khanitech's building" and could provide no other basis for suing Khanitech other than because it was the landlord for the building. Spoto Dep. at 232:17–233:6, 233:21–234:11.

## II.    The Contract between MaxRelief and Fulfyld

13.     In December 2017, Spoto and Khanijow were introduced through a broker. *Id*. at 39:7–19; Doc. 64 at ¶ 12.

14.     Following those initial discussions, MaxRelief began using Fulfyld as a fulfillment company. Spoto Dep. at 39:7–19.

15.     For the first few years of the parties' relationship, the parties did not have a written contract. *Id*. at 45:1–4, 58:7–17, 62:6–13, 66:10–12.

16.     Thereafter, on October 14, 2020, Fulfyld sent an E-Commerce Fulfillment Services Agreement (the "Contract") to Spoto for his review. Exhibit 6 to Spoto Dep. The Contract was signed by Ellis Williams on behalf of Fulfyld. *Id*. at p. 23; Spoto Dep. at 46:15–22.

17.    While Spoto never signed the Contract on behalf of MaxRelief, he later relied on provisions of that very Contract when Fulfyld sent notice of a rate increase. *See generally* Exhibits 3 and 4 to Spoto Dep.

18.    Specifically, in an April 2021 email to Jarom Haynie at Fulfyld, Spoto stated that new shipping and storage rates were negotiated in October 2020, that the rates were contained in the attached contract, that he could not find notice of the price increase in accordance with "clause 7 of the contract," and that he could not understand why the rates would increase so much "within 2–3 months of contract acceptance." Exhibit 3 to Spoto Dep., at p. 1; Spoto Dep. at 49:8–22, 61:3–63:6, 68:21–69:12.

19.    Spoto subsequently also sent the same email to Kelsey Huber ("Huber") at Fulfyld in July 2021. Exhibit 4 to Spoto Dep., at p. 1; Spoto Dep. at 52:11–15, 53:6–17, 55:6–10, 61:3–63:6, 62:14–63:6.

20.    In July 2021 correspondence with Huber, Spoto further stated that he did not believe a December 2020 price increase applied to him because he had a new contract that was two months old, *i.e.*, an October 2020 contract. Exhibit 5 to Spoto Dep.

21.    The Contract governed the fulfillment and packaging services provided by Fulfyld. Exhibit 2 to Spoto Dep. at p. 1.

22.    Pursuant to the Contract, Fulfyld could suspend its services at any time if the client was in breach of any obligation under the Contract. *Id*. at ¶ 8.4.

23.    The Contract provides that Fulfyld shall not be responsible "for any variance in the total volume of any Product held in inventory unless such variance exceeds 3% of the total volume of such Product (per sellable-SKU) against the last total Product volume amount communicated to the Client." *Id*. at ¶ 3.4.

24.    As part of the Contract's terms, the client, *i.e.*, MaxRelief, granted Fulfyld a security interest in all of its products in Fulfyld's possession as security for full payment of all sums due. *Id*. at ¶ 8.4.

25.    Moreover, the Contract states that "Fulfyld shall maintain a warehouseman's lien and security interest under the UCC for all Goods in Fulfyld's possession or control, regardless of whether a specific receipt is issued by Fulfyld, to cover all charges, expenses, costs and fees set forth in this Agreement." *Id*. at ¶ 9.6.

26.    The Contract provides that: "Fulfyld shall not, under any circumstances, be liable to Client for lost profits, consequential, incidental, special or indirect damages arising out of or related to this Agreement even if Fulfyld has been apprised of the likelihood of such damages or such damages were reasonably foreseeable." *Id*. at ¶ 12.2; *see also id*. at ¶ 13.3 (stating that "[i]n no event shall

Fulfyld be liable for any lost sales revenue from the inventory loss due to inventory count inaccuracies").

27.    The Contract's limitation of liability provision further states that Fulfyld's liability shall in no event exceed the amount received by it for the services complained of in the twelve-month period immediately prior to MaxRelief notifying Fulfyld of such action or claim. *Id.* at ¶ 13.

28.    As discussed below, MaxRelief notified Fulfyld of its missing inventory claim in October 2021; therefore, the twelve-month period under ¶ 13 of the Contract would have begun in October 2020 and ended in October 2021. *See id.*; *see also* Huber Dep. at 76:8–81:21; Exhibits 6 and 7 to Huber Dep.; July 2022 Khanijow Dep. at 64:12–65:4; Kelsey Huber Affidavit ("Huber Aff.") (Exhibit F) at ¶ 10.

29.    The invoices from October 2020 until October 2021 total $105,431.55. Huber Aff. at ¶ 10.

30.    The Contract makes clear that the terms of the agreement provide MaxRelief's exclusive remedy against Fulfyld for any claim, including inventory shortage and mysterious disappearance claims "unless proven by affirmative evidence that Fulfyld converted the inventory to its own use." Exhibit 2 to Spoto Dep. ¶ 13.2.

31.    The Contract also provides that MaxRelief would continue to hold the risk of loss of inventory until the products were delivered to the consumer and that Fulfyld is not liable for any loss or damage to the inventory stored at Fulfyld's facilities. *Id.* at ¶ 19.1.

32.    Within the Contract, only Fulfyld has the right to seek attorney's fees in the event that it has to pursue collection activities to receive payment. Exhibit 2 to Spoto Dep. at ¶ 11.1; Spoto Dep. at 72:20–75:4, 102:7–22.

### III.    The Dispute Between MaxRelief and Fulfyld

33.    During late 2021 and into early 2022, a dispute arose between MaxRelief and Fulfyld in which Fulfyld claimed that MaxRelief had multiple unpaid invoices and MaxRelief claimed that stock was missing and/or lost and that credits were owed. Huber Dep. at 76:8–81:21; Exhibits 6 and 7 to Huber Dep.; July 2022 Khanijow Dep. at 64:12–65:14.

34.    Fulfyld investigated MaxRelief's claim of missing stock and the other credits requested on the account (even though MaxRelief refused to provide information regarding these claims in Fulfyld's standard format), but the parties did not agree on the results of that investigation. Huber Dep. at 81:22–86:17; *see also* Exhibit 7 to Huber Dep.

35.    During the course of the parties' relationship, MaxRelief regularly directed that shipping labels be pre-printed, impacting the accuracy of inventory

numbers and records. Huber Aff. at ¶¶ 5–6, Exhibit 1 at pp. 2–3; Huber Dep. at 26:13–27:10, 30:8–31:5, 33:7–15, 34:17–35:19, 102:9–103:14, July 2022 Khanijow Dep. at 65:15–67:21, 70:12–21; Deposition of Frederik Dondorp ("Dondorp Dep.") (Exhibit G), at 21:4–20; Deposition of Robert Halstead ("Halstead Dep.") (Exhibit H), at 27:13–30:5, 42:3–43:20.

36.    As of February 2022, MaxRelief's outstanding balance was $18,248.50. *See* Feb. 20, 2022, Email String (Exhibit I).; *see also* Exhibit 8 to Spoto Dep., Rog. 7; Spoto Dep. at 75:6–11, 110:6–12.

37.    Because MaxRelief failed to pay its outstanding balance, its account was placed on a stop ship. Exhibits 6 and 7 to Huber Dep.

## IV.    MaxRelief's Alleged Damages

38.    In response to Defendant's First Consolidated Discovery Requests, MaxRelief responded that "[i]nformation concerning other damages, including lost profits, will also be disclosed in due course during expert witness discovery." MaxRelief's Feb. 14, 2023, Discovery Responses (Exhibit J), Rog. 6.

39.    In its supplemental discovery responses, MaxRelief asserted that it is entitled to damages in the amount of $449,305.89. Exhibit 8 to Spoto Dep., Rog. 7.

40.    MaxRelief's alleged damages consist of the following categories:

| | | | | | |
|---|---|---|---|---|---|
| 1. Audited Inventory Loss[2] | | | | | $106,464.00 |
| 2. Misdirected Freight | | | | | $  2,902.39 |
| 3. Accounting | | | | | $ 16,475.00 |
| 3. Legal | | | | | $ 74,896.00 |
| 4. Lost Profits / delay of stock | | | | | $268,497.00 |
| 5. Balance Due Fulfyld | | | | | -$ 18,248.50 |
| 6. Fulfyld Staff Assisting | 2 men, 8 hours, 3 days, $35/h | | | | -$  1,680.00 |
| | Claim | | | | $449,305.89 |

*See id.*

41.    MaxRelief claims that inventory is missing in the amount of $106,464. *Id.*; Spoto Dep. at 70:17–71:18. According to Spoto, this amount represents what MaxRelief would have received in revenue if it had sold the units that are allegedly missing. *Id.*; *see also id.* at 79:12–18.

42.    While already seeking $106,464 in damages for alleged missing inventory, MaxRelief also seeks $268,497.00 for alleged lost profits/delay of stock. Exhibit 8 to Spoto Dep., Rog. 7.

---

[2] Defendants dispute that any "audit" has been done in this case, despite Plaintiff's use of the term and dispute that there has been any loss calculation by auditors or other experts. Defendants are contemporaneously filing a motion to exclude the report Plaintiff appears to be referring to for its "Audited Inventory Loss."

43.     Even though MaxRelief initially stated that information regarding lost profits would be provided during expert discovery, it never disclosed an expert witness in this action. *See* Doc. 47 at pp. 7, 95; *see generally* Doc. 77 at ¶ 5.

44.     Spoto testified that he could not identify any dollar lost due to Fulfyld holding MaxRelief's products because he had "moved enough of it out to Simpel [another warehouse] in anticipation of this happening." Spoto Dep. at 251:15–23.

45.     Indeed, as of at least October 2021, MaxRelief had engaged Simpel[3] to perform the same services that had been previously done by Fulfyld. Spoto Dep. at 91:5–10.

46.     MaxRelief also seeks damages in the form of legal and accounting fees. Spoto Dep. at 72:20–75:4; Exhibit 8 to Spoto Dep., Rog. 7; Doc. 64, p. 15.

47.     Spoto agreed that there was no written document that grants MaxRelief the right to legal and accounting fees and that there is no statute applicable to this situation that allows the recovery of such fees. *Id*.; *see also id*. at 102:7–22.

48.     Indeed, Spoto agreed that there is no basis for the recovery of legal and accounting fees. *Id*.; *see also id*. at 102:7–22.

---

[3] Coincidentally, in May 2022, MaxRelief also sued Simpel and alleged that inventory was lost. Spoto Dep. at 11:13–13:20, 160:1–12; Exhibit 29 to Spoto Dep.

## STANDARD OF REVIEW

Summary judgment is proper when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*.

The party moving for summary judgment must demonstrate a prima facie showing that the non-movant does not have sufficient evidence to prove its case. *Id.* at 323. The burden then shifts to the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Id*. at 324; FED. R. CIV. P. 56(e). "To defeat a motion for summary judgment, the [non movant] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party. Summary judgment may be granted if the evidence is 'merely colorable.'" *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).

## ARGUMENT

I. **Because of the intracorporate conspiracy doctrine, Plaintiff's conspiracy claim fails, and Defendants are entitled to summary judgment.**

"Under Alabama law, a civil conspiracy requires a combination of two or more individuals to accomplish a lawful end by unlawful means." *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1281 (M.D. Ala. 1999). Moreover, the viability of a conspiracy claim depends upon the viability of the claim concerning the underlying wrong that is the subject of the conspiracy, *i.e.*, the conspiracy itself does not furnish a cause of action. *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d at 1281 (citing *Williams v. Norwest Financial Alabama, Inc.*, 723 So. 2d 97, 104 (Ala. Civ. App. 1998)).

MaxRelief's conspiracy claim is prohibited under the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine provides that an entity is not liable for an alleged conspiracy with its own employees or agents. *M & F Bank v. First Am. Title Ins. Co.*, 144 So. 3d 222, 234 (Ala. 2013). That is because the "acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Id.* (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010)). In other words, just as it is impossible for an individual person to conspire with themself, it is also impossible for a single entity to conspire with itself. *Id.*; *see also Stern v. Leath*, No.

3:18-CV-807-WKW, 2021 WL 2874113, at *2 (M.D. Ala. July 8, 2021) (Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.") (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)).

Here, it is indisputable that Khanijow is employed by Fulfyld as its CEO. Khanitech Dep. at 44:23–45:5. There is no evidence that Khanijow committed any act outside of the scope of his employment as Fulfyld's CEO. Therefore, his actions should be attributed to Fulfyld, and Defendants should be viewed as a single legal actor under basic agency principles. *See Stern v. Leath*, 2021 WL 2874113, at *2 (citing *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)). For these reasons, MaxRelief cannot satisfy the basic elements of a conspiracy claim, and Defendants are entitled to judgment as a matter of law.

## II.    Plaintiff's conversion claim against Fulfyld and Khanijow fails as a matter of law.

For MaxRelief to sustain its claim for conversion[4] against Fulfyld and Khanijow, "there must be (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful

---

[4] The Court noted in its March 26, 2025, order on Khanitech's motion to dismiss that conversion, misappropriation, and civil theft "are generally considered synonymous" and that here, MaxRelief is "simply asserting a conversion claim." Doc. 87, at note 2.

detention or interference with another's property." *Drennen Land & Timber Co. v. Privett*, 643 So. 2d 1347, 1349 (Ala. 1994) (citations omitted). As a threshold matter, while MaxRelief claims that items are missing, it has not produced substantial evidence that Fulfyld or Khanijow wrongfully *took* its products; illegally *asserted ownership of its products*; or illegally *used or misused its products*. Its claim appears to rest on the mere fact that Fulfyld allegedly could not account for certain items— not that Fulfyld actually converted them—which falls far short of establishing a claim for conversion:

> A defendant's mere access to money or property, coupled with the disappearance thereof, is not by itself sufficient evidence of conversion when there are other possible explanations for the disappearance of the property.

*Almond v. Randolph Cnty., Alabama*, 626 F. Supp. 3d 1218, 1241 (M.D. Ala. 2022) (citation omitted), *aff'd sub nom. Almond v. Walker*, No. 22-13405, 2023 WL 5622597 (11th Cir. Aug. 31, 2023); *see also*, *Heathcock v. Hadley*, 380 So. 2d 915, 917 (Ala. Civ. App. 1980). As indicated in Huber's affidavit and throughout deposition testimony, MaxRelief requested that shipping labels be pre-printed, impacting the accuracy of inventory numbers and records. Huber Aff. at ¶¶ 5–6, Exhibit 1 at pp. 2–3; Huber Dep. at 26:13–27:10, 30:8–31:5, 33:7–15, 34:17–35:19, 102:9–103:14, July 2022 Khanijow Dep. at 65:15–67:21, 70:12–21; Dondorp Dep. at 21:4–20; Halstead Dep. at 27:13–30:5, 42:3–43:20. Defendants' position is that it was this pre-printing that caused any appearance that stock was missing in

MaxRelief's inventory, and there is simply no evidence of any theft or misuse of MaxRelief's products, only MaxRelief's blanket, unfounded assertion that allegedly missing stock equals conversion, which is not the case.

MaxRelief's conversion count centers on its unsupported claim that "Defendants have converted, misappropriated, and/or otherwise stolen MaxRelief's inventory." Doc. 64 at ¶ 75. To the extent that this count is based on any allegations that Fulfyld wrongfully detained or interfered with its products when its goods were briefly held pending payment of MaxRelief's overdue invoice, that claim fails as a matter of law. Pursuant to the terms of their Contract, MaxRelief granted Fulfyld a security interest in all its products in Fulfyld's possession as security for the full payment of any and all sums due to Fulfyld. Exhibit 2 to Spoto Dep. at ¶ 8.4. Additionally, the Contract granted Fulfyld a lien on MaxRelief's goods. The Contract states in relevant part:

> If the Client is late in any payments, Fulfyld may suspend the Services without notice.
>
> You [MaxRelief] agree and acknowledge that Fulfyld shall maintain a warehouseman's lien and security interest under the UCC for all Goods in Fulfyld's possession or control, regardless of whether a specific receipt is issued by Fulfyld, to cover all charges, expenses, costs and fees set forth in this Agreement.

*Id.* at ¶ 11.1. Accordingly, MaxRelief cannot show that Fulfyld or Khanijow wrongfully detained or interfered with MaxRelief's products so as to constitute conversion.

Simply put, MaxRelief is required to provide more than bare assertions that Fulfyld and Khanijow personally stole or misappropriated its merchandise. And here, it cannot do so.

## III.    MaxRelief cannot show that Khanijow has been unjustly enriched.

MaxRelief has asserted a claim against Khanijow individually for unjust enrichment, thereby contending that he personally received a benefit from the allegedly improper disposal of MaxRelief's goods. Doc. 64, p. 13 at Count V. To prevail on this claim, MaxRelief must establish that Khanijow *knowingly* accepted and retained a benefit provided by MaxRelief. *Portofino Seaport Village, LLC v. Welch,* 4 So. 3d 1095, 1098 (Ala. 2008). It "must show that the defendant holds money which, in *equity and good conscience,* belongs to the plaintiff or holds money which was improperly paid to defendant because of *mistake or fraud.*" *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1122–23 (Ala. 2003) (citation and internal quotation marks omitted).

As with its conversion claim, MaxRelief cannot show that Khanijow engaged in any actual misconduct. Instead, it appears to rely on generic assertions of wrongdoing by Fulfyld.  It cannot point to substantial evidence that Khanijow knew about and received an unjust benefit—let alone personally "improperly disposed" of MaxRelief's goods. There is no evidence that Khanijow personally and knowingly kept, sold, or otherwise benefitted from the alleged loss of MaxRelief items. While

Spoto "*suspect[s]* they grabbed [his] masks instead of [Khanijow's] masks to fulfill an order[,]" such suspicion without further support is mere speculation and does not rise to the level required to defeat summary judgment. Spoto Dep. at 223:18–19; *see also* 222:17–223:17.

## IV.    The damages sought by MaxRelief should be limited in accordance with the express terms of the Contract.

In MaxRelief's interrogatory responses, MaxRelief contends that its total estimated damages are $449,305.89. Exhibit 8 to Spoto Dep., Rog. 7. MaxRelief's asserted damages consist in large part of: "audited" inventory loss in the amount of $106,464.00; lost profits/delay of stock in the amount of $268,497.00; attorney's fees in the amount of $74,896.00; and accounting fees in the amount of $16,475.00. *Id.* As discussed below, several of these categories of damages are either excluded or expressly limited under the terms of the parties' Contract. Moreover, during his deposition, Spoto, the sole employee and officer of MaxRelief, agreed there is no basis for recovery of attorney's fees or accounting fees. *See* Spoto Depo. at 77:9–78:4, 102:7–22.

### A.    Because MaxRelief ratified the Contract on numerous occasions, a valid contract exists between MaxRelief and Fulfyld.

While the parties did not have a contract for the few first years of their relationship, it is undisputed that Fulfyld sent a contract to Spoto, in his capacity as MaxRelief's sole employee and officer, in October 2020. *See* Spoto Dep. at 18:18–

21, 34:5–8, 46:15–22; Exhibit 6 to Spoto Dep. The Contract was signed by Ellis Williams on behalf of Fulfyld but was never signed by Spoto on behalf of MaxRelief. Exhibit 6 to Spoto Dep. at p. 23. Despite the fact that Spoto relied on provisions of that very contract in later discussions with representatives of Fulfyld and MaxRelief even asserted in the Amended Complaint that a valid contract existed, he attempted to change course during his deposition by proclaiming that there was no contract. Spoto Dep. at 46:15-22, 49:8–22, 52:11–15, 53:6–11, 55:6–63:6, 68:21–12; *see generally* Exhibits 3, 4, and 6 to Spoto Dep.; Doc. 64 ¶ 46–48, 54. While MaxRelief now tries to argue that no contract exists between the parties, such efforts are futile because the Contract was ratified by MaxRelief on multiple occasions.

In Alabama, "a party, by his actions and acceptance of the benefits of a contract and by operating under that contract, may ratify and confirm it, even though his actual signature is not affixed." *Rutherford v. Life Time Fitness, Inc.*, No. 2:21-CV-00377-KOB, 2022 WL 2974906, at *8–9 (N.D. Ala. July 27, 2022) (internal citations and quotations omitted). For ratification to occur, the ratifying party must act with knowledge of the "material facts surrounding the transaction." *Id*. at 8 (citing *Tuskegee Institute v. May Refrigeration Co., Inc.*, 344 So. 2d 156, 158 (Ala. 1977)).

Here, MaxRelief relied on provisions of the October 2020 contract when Fulfyld sent notice of a rate increase in 2021. *See generally* Exhibits 3 and 4 to Spoto

Dep. Specifically, Spoto sent emails to Fulfyld employees disputing the rate increase and stating new shipping and storage rates were negotiated in October 2020, that the rates were contained in the attached contract, that he could not find notice of the price increase in accordance with "clause 7 of the contract," and that he could not understand why the rates would increase so much "within 2–3 months of contract acceptance." Exhibit 3 to Spoto Dep., at p. 1; Spoto Dep. at 49:8–22, 61:3–63:6, 68:21–69:12. Spoto subsequently sent the same email to Huber in July 2021. Exhibit 4 to Spoto Dep., at p. 1; Spoto Dep. at 52:11–15, 53:6–17, 55:6–10, 61:3–23, 62:14–63:6. Spoto even went so far as to say that he did not believe a December 2020 price increase applied to MaxRelief because it had a new contract that was only two months old. Exhibit 5 to Spoto Dep. Spoto not only referenced the Contract in these email communications but also regularly attached it for Fulfyld's reference. *See generally* Exhibits 3 and 4 to Spoto Dep. Clearly, MaxRelief accepted the benefits of the Contract, operated in accordance with it, and had knowledge of its terms. *See Rutherford*, 2022 WL 2974906, at *8–9; *Holmes v. Sanders*, 729 So. 2d 314, 317 (Ala. 1999).

Simply put, during its relationship with Fulfyld, MaxRelief relied on certain provisions of the Contract that were beneficial to it but now seeks to conveniently avoid the burdens that the Contract imposed. Alabama law does not allow a party to avoid certain terms of a contract (such as limitations of liability) when that party also

"operat[ed] under that contract" and enjoyed its benefits. *Rutherford*, 2022 WL 2974906, at *9 (citing *Holmes v. Sanders*, 729 So. 2d at 317); *Southern Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1134–35 (Ala. 2000) (stating that "[a] plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions") (internal citations omitted). Based on the foregoing, Spoto's actions ratified the October 2020 Contract such that it became a legally enforceable contract. *See generally Holmes*, 729 So. 2d at 317.

### B. Many different provisions in the Contract limit MaxRelief's claimed damages.

Many of the damages sought by MaxRelief in this action are either barred or substantially limited under the terms of the Contract. It is well known that "[a] court must enforce an unambiguous contract as written, even if the result seems harsh." *Mullervy v. CAH Holdings, Inc.*, No. 2:22-CV-00174-SGC, 2024 WL 1142259, at *8 (N.D. Ala. Mar. 15, 2024) (citations omitted); *see also Stewart v. Bradley*, 15 So. 3d 533, 542 (Ala. Civ. App. 2008) ("Contracting parties have a right to express the limitations under which they will be bound, and such clearly manifested limitations will be recognized by the courts.") (quoting *Campbell v. Southern Roof Deck Applicators, Inc.*, 406 So. 2d 910, 913 (Ala. 1981)).

MaxRelief's efforts to recover lost profits fail because this category of damages is explicitly barred under the Contract. Specifically, the Contract provides that: "Fulfyld shall not, under any circumstances, be liable to Client for ***lost profits***,

consequential, incidental, special or indirect damages arising out of or related to this Agreement even if Fulfyld has been apprised of the likelihood of such damages or such damages were reasonably foreseeable." *Id.* at ¶ 12.2 (emphasis added); *see also id.* at ¶ 13.3 (stating that "[i]n no event shall Fulfyld be liable for any lost sales revenue from the inventory loss due to inventory count inaccuracies").

Defendants contend that MaxRelief's alleged lost inventory calculation also attempts to capture lost profits in contravention of the Contract. Indeed, Spoto testified during his deposition that the amount sought for lost inventory represents what MaxRelief would have received in revenue if it had sold the units that are allegedly missing. *Id.*; *see also* Spoto Dep. at 79:12–18.

While Defendants vehemently oppose MaxRelief's claims and assert that they are not liable under any of those claims, in the event that MaxRelief is successful as to any of its claims, any damages awarded should be in accordance with the Contract. The Contract expressly states that Fulfyld's liability shall not exceed the amount received by it for the services complained of in the preceding twelve-month period, *i.e.*, October 2020 through October 2021. Exhibit 2 to Spoto Dep. at ¶ 13. The invoices from October 2020 until October 2021 total $105,431.55. Huber Aff. at ¶ 10. Therefore, any potential recovery by MaxRelief in this litigation (which

Defendants strongly oppose) should be capped at $105,431.55.[5] Even so, it is important to note that Spoto testified that he could not identify any dollar lost due to Fulfyld holding MaxRelief's products. Spoto Dep. at 251:15–23.

Further, MaxRelief has presented no evidence supporting its claim for attorney's fees. This is not surprising since there is no provision in the Contract which would allow MaxRelief to recover attorney's fees. Indeed, only Fulfyld has the right to seek attorney's fees in the event that it has to pursue collection activities to receive payment. Exhibit 2 to Spoto Dep. at ¶ 11.1 (stating that "[MaxRelief] is responsible for all collection fees, including reasonable attorney's fees incurred by Fulfyld to receive payment"). Indeed, Spoto even agreed during his deposition that there was no written document granting MaxRelief the right to recover legal fees, and that there is no statute applicable to this situation that allows for the recovery of such fees. Spoto Dep. at 72:20–75:4, 77:9–78:4, 102:7–22.

Finally, Spoto's claim for accounting fees should be similarly prohibited. As with the attorney's fees, Spoto agreed during his deposition that there was no basis for the recovery of MaxRelief's accounting fees under either the Contract or any statute. *See id.*

---

[5] The $105,431.55 figure also includes unpaid invoices, some of which are the subject of Fulfyld's Affirmative Motion for Summary Judgment which is being filed contemporaneously herewith.

For all of these reasons, the damages sought by MaxRelief should either be excluded or limited in accordance with the parties' Contract.

### C. Alternatively, MaxRelief cannot substantiate its lost profits calculation because it failed to designate an expert witness.

While Defendants contend that MaxRelief is prohibited from seeking lost profits under the express terms of the Contract, alternatively, MaxRelief cannot substantiate its lost profits calculation because it failed to designate an expert witness. MaxRelief initially indicated in discovery that it would be designating an expert witness as to lost profits. *See* Doc. 47 at pp. 7, 95; *see generally* Doc. 77 at ¶ 5. Yet, no expert witness has been disclosed, and the Court's deadline for identifying such witnesses has long since passed. *See Schoen v. State Farm Fire & Cas. Co.*, No. CV 21-00264-JB-N, 2022 WL 16626191, at *2 (S.D. Ala. Nov. 1, 2022) (quoting *Jerkins v. Lincoln Elec. Co.*, 103 So. 3d 1, 10 (Ala. 2011) ("The award of damages cannot be made upon speculation, and the plaintiff has the burden of offering evidence tending to show, to the required degree, the amount of damages allegedly suffered.")).

## CONCLUSION

Defendants have demonstrated that there is no genuine dispute of any material fact and that they are entitled to judgment as a matter of law on various claims asserted by MaxRelief. In particular, Fulfyld and Khanijow are entitled to judgment as a matter of law as to MaxRelief's claims for conspiracy (Count VII) and

conversion (Count VI). Khanijow is also entitled to judgment as a matter of law as to the claim for unjust enrichment (Count V). In addition, the damages sought by MaxRelief should be barred and/or limited in accordance with the parties' Contract as discussed above. Therefore, Defendants respectfully request entry of a judgment in their favor as to the claims addressed in this motion.

Respectfully submitted on this 28th day of March, 2025.

*/s/ Amanda James Turnage*
Amanda James Turnage

**OF COUNSEL:**
G. Bartley Loftin, III
Amanda James Turnage
Jordan E. Loftin
Loftin Holt Hall & Hargett LLP
200 Clinton Ave. W, Ste 405
Huntsville, AL 35801
Telephone (256) 929-7997
jordan@loftinholt.com
bartley@loftinholt.com
amanda@loftinholt.com
*Attorneys for Defendants Fulfyld, LLC,*
*Khanitech, LLC and Ajesh Khanijow*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Elena L. Bauer
Benjamin B. Coulter
Denzel E. Okinedo
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
<u>bcoulter@burr.com</u>
<u>dokinedo@burr.com</u>
<u>ebauer@burr.com</u>
*Attorneys for Plaintiff MaxRelief USA, Inc.*

Charles A. Ray, IV, Esq.
200 Westside Square, Ste. 50
P.O. Box 13545
Huntsville, Alabama 35801
<u>cray@charlesraypc.com</u>
*Co-Counsel for Defendants Fulfyld, LLC,*
*Khanitech, LLC and Ajesh Khanijow*

<u>/s/ Amanda James Turnage</u>
OF COUNSEL
