# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| **MAXRELIEF USA, INC.,** ) | |
| ) | **CIVIL ACTION NO.** |
| *Plaintiff*, ) | |
| ) | **5:22-cv-00270-LCB** |
| v. ) | |
| ) | |
| **FULFYLD, LLC,** ) | |
| **KHANITECH, LLC, and** ) | |
| **AJESH KHANIJOW** ) | |
| *Defendants*. | |

## PLAINTIFF'S SUR-SUR-REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff MaxRelief USA, Inc. ("MaxRelief") files this limited sur-sur-reply to address new factual assertions included in the affidavit of Ajesh Khanijow (Doc. 128, Ex. A) filed with Defendants' sur-reply to MaxRelief's motion for summary judgment (Doc. 128). In support, MaxRelief states as follows:

## INTRODUCTION

In support of their sur-reply in opposition to MaxRelief's motion for summary judgment, Defendants submitted an affidavit from Ajesh Khanijow ("Khanijow"). The Khanijow affidavit includes at least three new related factual assertions: (1) that "roughly 5% of MaxRelief's shipments were Amazon FBA, Walmart Fulfillment Services (WFS), or others not from a direct-to-consumer sales channel" (2) that "[a]pproximately 95% of the shipments Fulfyld processed for MaxRelief were direct

1

to consumer shipments." (Doc. 128, 12 of 13, ¶¶ 4-5), and (3) "a two pack of 1000Hour Brow product advertised on Walmart by MaxRelief contained a SKU in the Fulfyld system for the set (Parent SKU) and for each of the two components making up the set (Child 1 SKU and Child 2 SKU). *Id.* Accordingly, some components were products that were sold to customers for which preprinted labels we requested." ("Doc. 128, 12 of 13, ¶ 6). As explained herein and confirmed in the declaration of Peter Spoto (attached hereto as **Exhibit A**), all three of these assertions are false. Defendants' pre-printed label theory has no actual grounding in the evidence or testimony in this case. For this reason, explained more fully below, Defendants have not shown a genuine dispute of material fact, and summary judgment is appropriate on MaxRelief's conversion claim.

## ARGUMENT

Defendants submitted an affidavit from Khanijow containing new factual assertions regarding MaxRelief's Fulfillment by Amazon ("FBA") shipments, which are wholly unsupported by any evidence. Spoto's declaration, offered here for the limited purpose of rebutting these assertions, is supported by the evidence and testimony in this case and explains why Defendants' assertions are false.

A further explanation of the different types of orders MaxRelief requested Fulfyld to ship is included for the sake of clarity. "Fulfilled by Amazon" shipments, or "FBA" shipments, were sent to Amazon warehouses. (Spoto Decl. at ¶¶ 4-5.) For

FBA shipments, Fulfyld was required to take a quantity of MaxRelief stored items, usually by the case, and apply a 1 inch x 2 5/8 inch FBA pre-printed self-adhesive white label to each item in the shipment. (*Id.* at ¶ 6.) MaxRelief provided the FBA labels to Fulfyld. (*Id.*) The items were then consolidated for shipment and sent to Amazon using another shipping label, also provided by MaxRelief. (*Id.* at ¶ 7.) No Fulfyld labels of any form were used in this process. (*Id.* at ¶ 8.) Fulfyld charged MaxRelief $35 per hour for FBA shipments. (*Id.* at ¶ 9.)

On the other hand, "Fulfilled by Merchant" shipments, or "FBM" shipments, were sent directly to consumers. (*Id.* at ¶ 10.) For FBM orders, Fulfyld was required to remove one MaxRelief stored item from the shelf, place it in a shipping bag or box, apply a Fulfyld created shipping label, and hand that item over to the carrier for shipment to the consumer. (*Id.* at ¶ 11.) Fulfyld charged MaxRelief a flat rate per piece for FBM shipments. (*Id.* at ¶ 12.)

Each week, Fulfyld would send MaxRelief an invoice summary for all work completed that week, along with the associated data file for reconciliation purposes. (*Id.* at ¶ 14.) An example of one of these invoice data files that Fulfyld sent MaxRelief is attached as **Exhibit 1** to Spoto's declaration. The superimposed graphic summarizes that for the invoice period associated with this specific data file, Fulfyld processed 20 FBM direct to consumer shipments and spent 2 hours at $35 (*Id.* at ¶ 16.)

Beginning in 2021, Fulfyld changed their data file methodology from showing only hours expended to showing the actual shipment quantities being processed per order, along with the total cost per order. (*See* **Exhibit 2** to Spoto Decl.) As the three example data files provided demonstrate, typically between 2 and 3 FBA units were labelled per minute, based on the amount MaxRelief was charged for FBA shipments and at the rate which Fulfyld was charging it ($35 per hour). (*See id.*; Spoto Decl. ¶ 18.) Based on the invoices Fulfyld sent MaxRelief over the entire course of the parties' business relationship, and using a conservative estimate of 2.5 items labelled per minute, FBA shipments accounted for **98.66%** of shipments in 2018, **96.83%** of shipments in 2019, **94.12%** of shipments in 2020, and **93.12%** of shipments in 2021. (*See id.* ¶ 20; **Exhibit 3** to Spoto Decl.)

The upshot of this—as MaxRelief has consistently explained—is that Fulfyld's pre-printed labels theory would have had little to no effect on the accuracy of inventory numbers because no Fulfyld provided labels were used for the overwhelming majority of MaxRelief shipments. The basic calculation using the parties' own invoices,[1] as explained above, plainly shows approximately 95% of MaxRelief's shipments were FBA shipments. It is simply not possible to conclude

---

[1] MaxRelief produced all invoices from the duration of its business relationship with Fulfyld. Thus, the evidence supporting the statement that FBA shipments accounted for 95% of MaxRelief's inventory, while FBM shipments accounted for only 5%, is not based on any new evidence, but is instead based on evidence that has been fully accessible to all parties for the majority of this litigation.

from this same evidence that only 5% of MaxRelief's shipments were FBA and 95% were FBM direct to consumer. And because no Fulfyld label whatsoever was used for FBA shipments, there cannot have been the largescale impact on MaxRelief's inventory numbers that Defendants would like them to have.

Spoto's deposition testimony confirms this. Defendants point to Spoto's statement that pre-printing labels was not something that Paul Kim did (Doc. 128 ¶¶ 18-19), but a closer look at Spoto's testimony shows that this statement was taken out of context. Later in the deposition, Spoto clarified that he would have requested labels be printed early *only for Walmart* orders—*not* for FBA orders:

> Q: Did you ever talk to him [Paul Kim] about a scenario where he was creating shipping labels in advance?
>
> A: No. Other than for Walmart.

(Spoto Deposition, Doc. 94-1, at 194:5-8). In other words, the only times Spoto would have ever requested a label be printed early would have been for Walmart FBM direct-to-consumer orders, where Walmart and *not* Fulfyld provided the label. These FBM orders, including Walmart represented roughly 5% or less of MaxRelief's overall orders. Spoto's deposition testimony is entirely consistent with the statements in his reply declaration—that FBA shipments accounted for roughly 95% of MaxRelief's shipments, while FBM shipments accounted for roughly 5%. Defendants' contention that the opposite is true—that FBA shipments accounted for

roughly 5% of MaxRelief's shipments—is entirely unsupported and directly contradicts the evidence and testimony presented in this case.[2]

In sum, the evidence confirms that FBA shipments accounted for the overwhelming majority of MaxRelief's inventory, while FBM direct-to consumer shipments accounted for a very small percentage. Fulfyld's theory of pre-printed labels, even if true, could only ever have been used for this small percentage of direct-to-consumer shipments. If this theory was actually applied to the FBM shipments post Paul Kim's final inventory count of July 2020, there was not enough volume of FBM shipments to have nearly a large enough impact on the accuracy MaxRelief's inventory numbers to account for the hundreds of thousands of dollars in missing inventory. (*See* Spoto Decl. ¶ 22; **Exhibit 5** to Spoto Decl.). Defendants' statements to the contrary are entirely unsupported and directly contradicted by the evidence. Because Defendants have still failed to account for MaxRelief's missing inventory, summary judgment on MaxRelief's conversion claim is due to be granted.

Khanijow's claim that a two pack of 1000 Hour Brow product involved components is also false. The components listed in Paul Kim's affidavit are clearly identified as separate brands that would never be comingled with a 1000 Hour Brow product. (Spoto Decl. ¶ 24.)

---

[2] Given MaxRelief's status as one of his first clients and his direct involvement during the course of MaxRelief's and Fulfyld's business relationship, Khanijow would undoubtedly know that the contention that FBA shipments were 5% of MaxRelief's overall shipments is false.

## CONCLUSION

WHEREFORE, MaxRelief respectfully requests entry of a judgment in its favor on its conversion claim.

Dated: September 9, 2025          Respectfully submitted,

/s/ Benjamin B. Coulter
Benjamin B. Coulter
Elena L. Bauer
Molly M. Glisson

**BURR & FORMAN LLP**
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
bcoulter@burr.com
ebauer@burr.com
mglisson@burr.com

*Attorneys for Plaintiff,*
*MaxRelief USA, Inc.*

## **CERTIFICATE OF SERVICE**

    I hereby certify that I have served a copy of the foregoing document on all parties by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax, or email on September 9, 2025:

G. Bartley Loftin, III
Amanda J. Turnage
Jordan E. Loftin
Loftin Holt Hall & Hargett LLP
200 Clinton Ave. W, Ste 405
Huntsville, AL 35801
bartley@loftinholt.com
amanda@loftinholt.com
jordan@loftinholt.com

                                            */s/ Benjamin B. Coulter*
                                            OF COUNSEL